UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KENNETH W. FARR, | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
|     *vs.* | ) | No. 1:13-cv-01266-JMS-DKL |
| | ) | |
| ROLLS-ROYCE CORP., ET AL., | ) | |
|     *Defendants*. | ) | |

## ORDER

Plaintiff Kenneth W. Farr brings this suit against Defendants Rolls-Royce Corp., Rolls-Royce North American, Inc., Rolls-Royce North America Holdings, Inc., and Rolls-Royce North American (USA) Holdings Co. (collectively, "Rolls-Royce"), asserting claims under the Employee Retirement Income Security Act ("ERISA") and state law. [Filing No. 1.] Presently pending before the Court is Rolls-Royce's Motion for Summary Judgment. [Filing No. 23.] For the reasons that follow, the Court **GRANTS** Rolls-Royce's motion.

**I.**
**TYPE OF MOTION AND STANDARD OF REVIEW**

**A.    Whether Rolls-Royce's Motion is Properly Filed as a Motion for Summary Judgment and Whether Mr. Farr is Entitled to Further Discovery**

Mr. Farr asserts that "Rolls-Royce's Motion for Summary Judgment should be considered a Motion to Dismiss" because "Rolls-Royce has prematurely filed a Motion for Summary Judgment without a complete factual record." [Filing No. 32 at 8.] Mr. Farr cites no authority for this proposition. This is likely because Rolls-Royce is of course permitted to file whatever type of motion it sees fit so long as it complies with the Federal Rules of Civil Procedure in doing so, which provide that "a party may file a motion for summary judgment *at any time* until 30 days after the close of discovery." Fed. R. Civ. P. 56(b) (emphasis added). Accordingly, the Court will treat Rolls-Royce's motion as one for summary judgment, not as a motion to dismiss.

Mr. Farr next asserts that "if the Court is in any way inclined to grant the Motion for Summary Judgment in favor of Rolls-Royce . . . this Court must at least allow Mr. Farr to pursue basic documents and deposition testimony pursuant to Rule 56(D)." [Filing No. 32 at 8.] But Federal Rule of Civil Procedure 56(d) makes clear that, under the circumstances here, the Court is not required to allow further discovery. Federal Rule of Civil Procedure 56(d) provides:

> (d) When Facts Are Unavailable to the Nonmovant. If a nonmovant *shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition*, the court may:
>
> > (1) defer considering the motion or deny it;
> >
> > (2) allow time to obtain affidavits or declarations or to take discovery; or
> >
> > (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d) (emphasis added). Mr. Farr has not complied with the requirements of this rule to be entitled to any relief under it. He did not submit an affidavit or declaration, nor did he set forth specified reasons (as opposed to general ones) why he cannot present essential facts to support his opposition. Accordingly, for either of these reasons, Mr. Farr is not entitled to any relief pursuant to Rule 56(d).

### B.     Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse

party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured

the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### FACTUAL BACKGROUND

The following factual background is drawn from the admissible evidence presented by the parties. The facts presented are those that are undisputed or, if disputed, are set forth in the light most favorable to the non-movant, Mr. Farr.

Mr. Farr was employed by Rolls-Royce for over sixteen years, from 1994 to 2011. [Filing No. 25-1, at ECF p. 2; Filing No. 32-1, at ECF p. 1.] During his employment, Rolls-Royce offered all "Legacy Employees," such as Mr. Farr, an incentive payment to transition from the "EPO/PPO" health benefit plan to a high-deductible health benefit plan (the "Incentive Program"). [Filing No. 25-1, at ECF p. 3.] The Incentive Program offered Legacy Employees a lump sum payment of "up to $75,000.00 based on years of credited service." [Filing No. 32-2, at ECF p. 1.] The payment for a particular employee depended on the number of years the employee had worked for Rolls-Royce multiplied by an amount corresponding to the year during which the employee agreed to transition to the high-deductible plan ($2,500 in 2011; $1,250 in 2012; $1,000 in 2013). [Filing No. 32-2, at ECF p. 1.]

On August 9, 2011, Mr. Farr signed a document (the "Incentive Agreement") agreeing to take part in the Incentive Program. [Filing No. 32-1, at ECF p. 5.] Based on his sixteen years of service, Mr. Farr was entitled to $40,000 under the Incentive Program. [Filing No. 32-1, at ECF p. 5.] The parties do not dispute that, around this same time, Mr. Farr was arrested on charges relating to the unlawful possession of Rolls-Royce property. Although the parties discuss them

at length, the specifics of Mr. Farr's criminal matter are not relevant to the instant motion. The charges against Mr. Farr led Rolls-Royce to terminate Mr. Farr's employment on September 20, 2011. [Filing No. 25-1, at ECF p. 3.]

Rolls-Royce never paid Mr. Farr any money pursuant to the Incentive Agreement. [Filing No. 32-1, at ECF p. 2.] The parties dispute when Mr. Farr was supposed to transition to the high-deductible plan pursuant to the executed Incentive Agreement. Rolls-Royce presents evidence that payment was not due until January 1, 2012, [Filing No. 25-1, at ECF p. 3], but Mr. Farr presents contrary evidence, [Filing No. 32-2, at ECF p. 1]. This dispute of fact must be resolved in Mr. Farr's favor at this stage in the litigation, but, in the end, the dispute is irrelevant to the Court's ultimate decision on Mr. Farr's federal claim.

Following the termination of his employment, Mr. Farr brought the instant suit against Rolls-Royce. [Filing No. 1.] He seeks to recover, among other things, the $40,000 he contends Rolls-Royce owes him under the Incentive Agreement. [Filing No. 1, at ECF p. 4-5.]

### III.
#### DISCUSSION

Rolls-Royce moves for summary judgment on Mr. Farr's ERISA claims on the ground that the Incentive Program is not an ERISA plan and thus he cannot bring claims under ERISA. [Filing No. 24 at 4-8.] Without cognizable ERISA claims, says Rolls-Royce, the Court does not have federal question jurisdiction and the Court should decline to exercise supplemental jurisdiction over Mr. Farr's remaining state-law claims. [Filing No. 24 at 9.] The Court addresses each issue in turn.

A. **Whether Rolls-Royce's Incentive Program Constitutes an ERISA plan**

The determinative issue is whether the Incentive Program constitutes an ERISA plan. Rolls-Royce contends that the Incentive Program is not an ERISA plan, [Filing No. 24 at 4],

while Mr. Farr disagrees, [Filing No. 32 at 5]. ERISA defines a "plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both . . . ." 29 U.S.C. § 1002(3). The parties solely dispute whether the Incentive Program constitutes an "employee welfare benefit plan," which is defined in relevant part as "any plan, fund, or program . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, [or] disability . . . ," 29 U.S.C. § 1002(1). The statute does not, however, further explain what constitutes a "plan, fund, or program." *Massachusetts v. Morash*, 490 U.S. 107, 114 (1989).

Rolls-Royce contends that the Incentive Program is nothing more than a one-time lump sum payment to employees who participate in the Incentive Program, and that the Supreme Court has held that such programs are not ERISA plans. [Filing No. 24 at 8 (citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987))]. Mr. Farr responds that the Incentive Program is more than merely a one-time lump sum payment to employees because the Inventive Program contemplates payments to employees "throughout 2011, 2012, and 2013." [Filing No. 32 at 5-6 (citing Filing No. 32-2 at 1).] This fact, says Mr. Farr, makes this case "identical" to *Collins v. Ralston Purina Co.*, 147 F.3d 592 (7th Cir. 1998), where the Seventh Circuit found that the company program at issue was an ERISA plan. [Filing No. 32 at 6.] Rolls-Royce replies that the Incentive Program is a not at all analogous to the program at issue in *Collins*. [Filing No. 33 at 2-10.] Specifically, Rolls-Royce argues that it is undisputed that the Incentive Program "provides certain employees . . . with a one-time, lump sum payment, which is calculated based on a

simple, nondiscretionary, mechanical formula of a fixed dollar amount times the number of years of the employee's service, up to 30 years." [Filing No. 33 at 2.]

For the reasons explained below, the Court agrees with Rolls-Royce that the Incentive Program is not an ERISA plan.[1] The Incentive Program is analogous to the statute at issue in *Fort Halifax* that was deemed to not be an ERISA plan, and it is distinguishable in key respects from the severance program in *Collins* that was held to be an ERISA plan. An analysis of these two cases demonstrates why this is so. Moreover, these cases and others show that when, as here, the program at issue requires only the payment of a single sum upon the occurrence of a triggering event, and does not otherwise require discretionary decisions to administer, the program is not an ERISA plan.

The issue in *Fort Halifax* was whether a Maine statute that required a severance payment to employees of certain employers when the employer relocates or otherwise terminates business operations constitutes the establishment an ERISA plan. 482 U.S. at 3-4. The Supreme Court held that the statute did not establish an ERISA plan because it merely required a "one-time, lump-sum payment triggered by a single event" and required "no administrative scheme whatsoever to meet the employer's obligation." Id. at 12. Specifically, "[t]he employer assumes no re-

---

[1] Mr. Farr also argues that the Incentive Program is "simply part" of Rolls Royce's ERISA welfare-benefit plan because "Rolls-Royce's fiduciary implemented the [Incentive] [P]rogram as a corollary plan to better manage the underlying welfare benefit plan." [Filing No. 32 at 7-8.] This argument is a non-starter for at least two reasons. First, Mr. Farr presents no evidence supporting his argument; it is mere conjecture and speculation. The only evidence he cites is the fact that Rolls-Royce's ERISA fiduciary submitted an affidavit in support of Rolls-Royce's Motion for Summary Judgment. [Filing No. 32 at 7 (citing Filing No. 25-2).] But the fiduciary's affidavit merely authenticates two exhibits and describes the benefit plans in which Mr. Farr participated. [*See* Filing No. 25-2 at 2-3.] Second, even if there was evidence supporting Mr. Farr's argument, he cites no legal authority for the proposition that a program intended to assist an ERISA plan necessarily makes the program itself an ERISA plan. For both of these reasons, the Court rejects this argument.

sponsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control." *Id.* This is because the severance payment was a one-time event, and "[o]nce this single event is over, the employer has no further responsibility." *Id.* In the end, the Supreme Court reasoned, "[t]he theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits." *Id.* It cannot, therefore, be considered "an employee benefit *plan*." *Id.* (emphasis in original).

The Seventh Circuit in *Collins* had to apply *Fort Halifax* to a different situation—whether a company's retention agreements constituted an ERISA plan. 147 F.3d at 593-94. The retention agreements were made between the company and its upper-level managers, and they provided that the company would pay each manager "six months salary . . . if he was terminated by [the company's] prospective acquirer[.]" *Id.* at 594. However, under the retention agreements, termination included not just termination itself but also covered "any substantial reduction of duties or responsibilities." *Id.* The Seventh Circuit distinguished the retention agreements from the severance payments at issue in *Fort Halifax*: "By contrast [to *Fort Halifax*, the company] faced the prospect of multiple payments to various managers, at different times and under different circumstances." *Collins,* 147 F.3d at 595; *id.* at 596 ("Unlike *Fort Halifax*'s potential one-time liability, [the company here] faced a year in which various managers might demand payouts under the individual agreements, and perhaps more than one time each if not successful on their first attempt to show that their job responsibilities had been 'substantially reduced.'"). But even more critical to the Seventh Circuit's decision was the fact that "[e]ven the triggering event prompting a payout in this case presupposes careful claims processing, in other words, an ongoing administrative scheme," as the retention agreements required a payout "only

if a manager's job responsibilities were 'substantially reduced,' which sets a standard, but hardly an easily discernible one." *Id.* at 596. It was this necessary exercise of discretion that required the company to utilize an ongoing administrative scheme to implement the retention agreements, and for the Seventh Circuit, this was the key point distinguishing *Collins* from *Fort Halifax*. *See id.* at 597 ("Ultimately, what makes [the company's] plan subject to ERISA in this case is no different from those factors . . . that convinced the Supreme Court in *Fort Halifax* to find against it. [The company's] plan required it to exercise discretion on an ongoing basis; using certain criteria, the company could determine that some managers experienced substantial reductions in their job duties, while others did not."). *Collins* was not a case, like *Fort Halifax*, where the company could mechanistically make payments to those entitled to them; instead, the company had to use an administrative scheme to make "nonclerical judgment calls." *Id.* (citation and quotation marks omitted). In the end, the Seventh Circuit found that this type of "prolonged individualized decision-making concerning benefits describes a plan subject to ERISA." *Id.*

Mr. Farr contends that the Incentive Program is analogous to the program in *Collins* because both require "multiple payments to various managers, at different times and under different circumstances," while the program in *Fort Halifax* required the employer to make "all at once . . . 'a single set of payments to employees at the time the plant closes.'" 147 F.3d at 595 (quoting *Fort Halifax*, 482 U.S. at 12). This distinguishing fact, says Mr. Farr, shows that the Incentive Program "is identical to the plan in *Collins* because Rolls-Royce cannot make a single payment at one particular time," as "Rolls-Royce will be paying out varying amounts to various employees over a period of at least three (3) years." [Filing No. 32 at 6.] But as the above analysis of *Collins* makes clear, the Seventh Circuit did not rest its entire holding on the fact that multiple payments were required at various times over an extended period. *See Ankenbruck v. Rochester*

*Midland Corp.*, 2006 WL 2524116, *3 (N.D. Ind. 2006) (noting that, "*in addition* to periodic demands [on the employer's assets], to fall under ERISA, a severance policy must require an employer to make nonclerical judgment calls on multiple occasions) (emphasis added) (citation and quotation marks omitted). Instead, the Seventh Circuit repeatedly made clear that *Collins* was "[u]ltimately" distinguishable from *Fort Halifax* because the company's plan "required it to *exercise discretion* on an ongoing basis," and it is this exercise in discretion that required the use of an ongoing administrative scheme that was not present in *Fort Halifax*. *Collins*, 147 F.3d at 597 (emphasis added); *see id.* ("The important point is . . . that [the company's program] . . . requir[ed] it to make nonclerical 'judgment calls.'"); *id.* at 596 ("Even the triggering event prompting a payout in this case presupposes careful claims processing, in other words, an ongoing administrative claim," as the company was "required . . . to pay only if a manager's job responsibilities were 'substantially reduced,' which sets a standard, but hardly an easily discernible one."); *id.* ("Only an ongoing administrative scheme would allow the company to develop a working definition of 'substantial reduction of duties or responsibilities,' such that it could be consistently applied either to a single employee on multiple occasions or multiple employees on multiple occasions. It is exactly this prospect of multiplicity and record-keeping that distinguishes [this] case from the one-time, routine disbursement facing the Court in *Fort Halifax*."); *see also Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 631 (7th Cir. 2001) (describing *Collins* as "conclud[ing] that because the plan required the employer to make 'nonclerical judgment calls' on multiple occasions, an ongoing administrative scheme existed that brought the plan within ERISA's coverage") (quoting *Collins*, 147 F.3d at 597); *Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1375 (7th Cir. 1997) ("Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an administra-

tive system may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.") (citation and quotation marks omitted), *abrogated on other grounds by Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Rabine*, 161 F.3d 427, 430 (7th Cir. 1998).

Cases following *Collins* continue to turn on whether the administrator of the program at issue has to make discretionary decisions. For example, in *Bowles*, the Seventh Circuit held that a severance plan similar to the one in *Collins* was an ERISA plan not only because the employer had "to budget for the possibility of making multiple payments throughout the course of a year," but also because the severance plan "was not capable of a mechanical application, but required the exercise of discretion." *Bowles*, 266 F.3d at 632; *see id.* (noting that the employer had to make a "nonclerical judgment call" as to whether an employee was entitled to a severance payment and distinguishing *Bogue* on the grounds that the required "individualized investigation and assessment demonstrates that [the company] could not fulfill its obligations under the severance plan through a single, mechanical, nondiscretionary application of the plan's terms"). Moreover, the Seventh Circuit found *Bowles* distinguishable from the cases "that have fallen on the non-ERISA side of the line" because *Bowles* was "not [a case] in which the administrator was required to make simple arithmetical computation." *Id.* at 632-33 (collecting cases).

The foregoing cases reinforce what *Collins* made clear—namely, that a simple program that does not require significant discretion to implement does not constitute an ERISA plan. *Cf. id.* at 633 (noting that even programs that require an "insignificant" amount of discretion are not ERISA plans). The Incentive Program here does not require discretion to implement and is therefore analogous to the severance payments at issue in *Fort Halifax*. Under the Incentive Program, an employee could receive a one-time, lump sum payment of "up to $75,000.00 based

on years of credited service." [Filing No. 32-2, at ECF p. 1.] The payment for a particular employee was calculated by multiplying the number of years the employee had worked for Rolls-Royce by an amount corresponding to the year the employee agreed to transition to the high-deductible plan ($2,500 in 2011; $1,250 in 2012; $1,000 in 2013). [Filing No. 32-2, at ECF p. 1.] In sum, the Incentive Program creates the potential for payments to be made to employees at any time during a three-year period, but it requires no discretion on Rolls-Royce's part to administer; an employee who signs an Incentive Agreement at any time during the three-year period will receive an amount equal to his or her number of years' service multiplied by the dollar amount corresponding to the year he or she entered into the Incentive Agreement. [Filing No. 32-2, at ECF p. 1.]

Accordingly, similar to the severance payment at issue in *Fort Halifax*, the Incentive Program at issue here requires Rolls-Royce to only make a "one-time, lump-sum payment triggered by a single event" (the signing of an Incentive Agreement). 482 U.S. at 12. And when, as here, "the employer has no discretion in determining whether the benefits should be paid and does no more than simple calculations to determine the amount of the benefit that is owed to an employee as a result of some triggering event, then ERISA's protections do not apply." *Ankenbruck*, 2006 WL 2524116, at * 3 (citing *Bowles*, 266 F.3d at 632). Accordingly, Rolls-Royce's Incentive Program does not constitute an ERISA plan, and thus the Court does not have subject-matter jurisdiction over Mr. Farr's ERISA claim. *See Rice v. Panchal*, 65 F.3d 637, 646 (7th Cir. 1995).

### B. Remaining State Law Claims

Because the Court concludes that it must dismiss Mr. Farr's ERISA claim, no federal claims remain in this litigation. Moreover, Mr. Farr never invoked the Court's diversity jurisdic-

tion because the required amount in controversy is not met. The Court must therefore assess whether it should continue to exercise supplemental jurisdiction over Mr. Farr's state law claims.

The Court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Tech., Inc. v. HIF BIO, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see Sharp Electronics Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (citation and quotation marks omitted).

The relevant factors all weigh in favor of the Court declining to exercise supplemental jurisdiction over Mr. Farr's state law claims. The parties have yet to develop any arguments regarding those claims; indeed, the briefing for the instant motion solely addresses Mr. Farr's ERISA claim. Thus, retaining jurisdiction over the state law claims would not promote judicial economy. Furthermore, comity favors Indiana courts resolving Mr. Farr's state law claims. Finally, the Court is not aware of any fairness or convenience concerns that militate toward retaining jurisdiction over the state law claims at this early stage in the proceedings. For these reasons,

the Court, in its discretion, declines to continue exercising supplemental jurisdiction over Mr. Farr's state law claims. *See* 28 U.S.C. § 1367(c)(3); *Groce*, 193 F.3d at 501.

## IV.
### CONCLUSION

For the reasons explained, the Court **GRANTS** Rolls-Royce's Motion for Summary Judgment. [Filing No. 23.] Mr. Farr's ERISA claims are dismissed with prejudice, but his state law claims over which the Court has declined to exercise supplemental jurisdiction are dismissed without prejudice. In light of Rolls-Royce's request for a briefing schedule regarding attorney's fees, [Filing No. 24 at 9], the Court asks the Magistrate Judge to meet with the parties to see if an agreement on fees can be reached. If an agreement cannot be reached, the Magistrate Judge should set a briefing schedule regarding the propriety of an award of attorney's fees. Final judgment will issue accordingly.

**Distribution via ECF to all counsel of record**